**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION  II**

| | |
|---|---|
| STATE OF WASHINGTON | No. 52948-3-II |
| Respondent, | |
| v. | |
| STEPHEN WILLIAM GATES, | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, J. – Stephen William Gates appeals from his jury trial conviction for unlawful possession of a controlled substance, methamphetamine. Gates argues that the State engaged in prosecutorial misconduct by cross-examining him about witness credibility and by referring in closing argument to his failure to call witnesses in support of his unwitting possession defense. Because Gates fails to show that the witness credibility testimony was prejudicial and referring to Gates's failure to call witnesses in support of his affirmative defense was not improper under *State v. Sundberg*, 185 Wn.2d 147, 370 P.3d 1 (2016), Gates's prosecutorial misconduct claims fail.

Gates further challenges the trial court's orders requiring that a private entity supervise his community custody and requiring him to undergo a chemical dependency evaluation. Because the trial court did not impose community custody, Gates's argument that the trial court exceeded its authority by requiring a private entity to supervise community custody rather than the Department of Corrections (DOC) fails. But the State concedes that the trial court erred by requiring a chemical

dependency evaluation without entering a finding that a chemical dependency contributed to the offense, and we accept the State's concession.

Accordingly, we affirm Gates's conviction, but we remand for the trial court to vacate the order for compliance monitoring to the extent it applies to the chemical dependency evaluation and treatment.

## FACTS

### I. BACKGROUND

In the early morning hours of March 21, 2018, staff working at the 7 Cedars Casino discovered a small bag containing methamphetamine on the casino floor. Casino security watched the surveillance tapes of the area where the bag had been found and saw Gates drop the bag from his left hand.

The casino staff contacted the sheriff's office. Clallam County Deputy Sheriffs James Dixon and Benjamin Tomco responded to the casino, reviewed the security tapes, located Gates, took him to the security office, and questioned him. After Dixon field tested the substance in the bag, Tomco arrested Gates.

The State charged Gates with unlawful possession of a controlled substance, methamphetamine. The case proceeded to a jury trial.

### II. TRIAL

#### A. DIXON'S AND TOMCO'S TESTIMONIES

At trial, Dixon testified that the surveillance video showed the bag of methamphetamine falling from Gates's left hand onto the casino floor. Dixon also testified about his initial contact with Gates.

Dixon stated that when he first detained Gates, he told Gates that he was being detained "because [Dixon] had seen . . . a bag of a crystal substance fall from him." Verbatim Report of Proceeding (VRP) at 104. Gates responded "that he didn't do drugs and then [Gates] said it might have been his medication." *Id.* at 104. When Dixon told Gates that "it looked like crystal methamphetamine," Gates denied doing drugs other than marijuana and said that "he didn't know what was in his pockets." *Id.* at 104.

Tomco testified that when he was patting Gates down after he was detained, he [Tomco] commented to Gates "that his shoes look[ed] new," and Gates initially responded, "[Y]eah, my pants are new too." *Id.* at 126. Tomco stated that Gates "then caught himself and said these are not my pants." *Id.* at 126.

B. GATES'S TESTIMONY

Gates was the sole defense witness. He testified that on March 20, he had been working with his friend John Nichols and that his (Gates's) clothes had gotten dirty. Because Gates had a first date that evening with a woman named Christina and he did not have time to go home to change for the date, Gates borrowed some pants and a shirt from Nichols. Because he did not like wearing other people's shoes, he stopped by a store and purchased some shoes and socks before picking up Christina.

Gates denied knowing that the drugs were in his pocket, but he admitted that after he watched the surveillance video he knew the drugs had come out of his pocket. He testified that he contacted Christina after his arrest and that she had admitted to him that she had handed him the bag of methamphetamine when she returned some change to him after purchasing some cigarettes with his money.

On direct examination, Gates testified that when Dixon had first contacted him in the casino, Dixon had asked him if he had dropped "a bag of dope." *Id.* at 163. During cross-examination, the State questioned Gates about the discrepancy between this testimony and Dixon's testimony that he had asked Gates about a bag of methamphetamine. Gates testified that he was "not saying that [Dixon] changed his story," and commented that he was "just saying [Dixon's] mistaken because he told me dope." *Id.* at 181. Defense counsel did not object to his line of questioning.

When defense counsel questioned Gates about his conversation with Tomco about his (Gates's) shoes and clothes, Gates testified that he had told Tomco that his clothes were new too but that they were not his. Later, on cross-examination, the State asked Gates if he "disagree[d] with" Tomco's testimony about what Gates had said about his clothing and about Dixon's initial comment to him:

> Q  Deputy Tomco testified that you said, "yeah my pants are new too". Then you caught yourself and said these aren't my pants.
> A  They're meaning me. I can't expect anybody to read through the lines and I've got to tell you I wasn't the one documenting every word I did that night. These gentlemen are trained to do it.
> Q  So they're trying to document everything that you say, that's part of their job.
> A  Yeah.
> . . . .
> Q  (By Mr. Snipe)  Just to clarify, you're still convinced that he said dope and that he's wrong?
> A  He's mistaken.

*Id.* at 184. Gates did not object to this exchange on grounds that it was a comment on the witnesses' credibility or veracity.

On cross-examination, the State asked Gates if he was "still associated with John Nichols" and whether he had asked Nichols to be in court that day. *Id.* at 171-72. Gates responded that he still knew Nichols, but that he had not asked Nichols to be at the trial or for a statement.

On redirect, defense counsel asked Gates if his "relationship with Christina was good enough that she would (inaudible) event [sic] to committing a felony that she hadn't been charged with?" *Id.* at 185. Gates responded, "No." *Id.* at 185. He also testified that he had not been able to "find her" after she had admitted to him that they were her drugs. *Id.* at 185.

C. CLOSING ARGUMENTS

In its closing argument, the State commented that there was no evidence that Gates had attempted to subpoena Christina or Nichols to testify, that they had not testified, and that there were no statements from them admitted at trial. Gates did not object to this argument.

In his closing argument, Gates argued unwitting possession based on Christina giving the drugs to Gates without his knowledge rather than the fact he had been wearing Nichols's pants. In rebuttal, the State argued that it had proved the elements of the offense beyond a reasonable doubt but that Gates had not proven his unwitting possession defense, in part because he did not present any evidence from Christina or Nichols. Gates did not object to this argument.

The jury found Gates guilty of possession of a controlled substance, methamphetamine.

III. SENTENCING

At sentencing, the State asked the trial court to find that Gates had a chemical dependency that contributed to the offense and to order Gates to undergo a controlled substances use evaluation and follow the recommended treatment. Gates argued that there was no evidence to support a finding that Gates had a chemical dependency.

Trial court made the following oral ruling:

> Okay, here's what I'm going to do. You don't have a history. *I can't really make a finding of chemical dependency* because there's nothing in front of me to say that you have a chemical dependence but I think as part of a sentence in a drug case I can still at least require you to get an evaluation and follow a recommendations on treatment. If you get an evaluation and an evaluator says you

5

don't have any kind of significant problem then you wouldn't have to participate in treatment so I'm going to leave that up to an evaluator.

. . . .

So, at any rate *I'm not going to put you on DOC supervision*, that doesn't make any sense. I think if I sent you down to DOC they'd turn back and say this guy has no history we're not going supervise him so I am going to do what I normally do for anybody who gets charged with a methamphetamine possession no matter what. Just about every time I have a meth case we give 30 days. If you have no prior history and those 30 days are converted to 240 hours of community service so that's what I'm going to do. *I'll give you 30 days convert that to 240 hours of community service work and that will be supervised by Friendship Diversion Services*. Now *they're going to supervise in two ways*. You're ordered to do 240 hours of community service work in lieu of 30 days jail and *also as part of the sentence you're also to get an evaluation and follow recommendations on treatment so Friendship Diversion will oversee that so they'll say go get an evaluation*. If the evaluation says go to, you know, any kind of treatment or suggested programs then you'll have to do it but I'm going to leave that up to the evaluation and – this is an order assigning community service work. There's also *Friendship Diversion* does supervision. Is there a separate order for that one? So I'm going to have *Friendship Diversion* monitor as well so maybe we'll do both of those.

. . . .

. . . I've signed an order assigning the Community Service and I'm signing the order for compliance so *you're going to have twelve months of compliance monitoring to Friend Diversion. They're going to monitor to make sure you get your community service done. They're also going to make sure that you get an evaluation and follow the recommendations on treatment* and you're to report to them no later than I guess the end of next week so I'm going to put 1-18-2019. So you have a week to tie up with them and set up their monitoring of you in regard to this matter.

*Id.* at 248-54 (emphasis added).

In the judgment and sentence, the trial court initially marked the box stating that it had made a special finding that "[t]he defendant has a chemical dependency that has contributed to the offense(s). RCW 9.4A.607." Clerk's Papers (CP) at 19. But it then crossed out the finding in its entirety.

The court sentenced Gates to 30 days of total confinement under the first-time offender waiver and converted the 30 days to "240 hours of community restitution (service) . . . under the supervision of the [DOC] to be completed: on a schedule established by Friendship Diversion

Services." *Id.* at 21. The trial court struck out the section of the judgement and sentence related to community custody.

The trial court also entered an "Order Assigning Community Service Work." Supplemental Clerk's Papers (CPS) at 63 (capitalization altered). This order stated that in lieu of 30 days of jail time, the court ordered Gates "to perform 240 hours of community service work." *Id.* at 63. It further stated, "Defendant shall report for assignment to community service within three days of release from incarceration or within three days of the date of this order to Friendship Diversion Services." *Id.* at 63 (emphasis omitted).

Additionally, the trial court filed an "Order for Compliance Monitoring." *Id.* at 64 (capitalization altered). This order stated, in part,

> The Defendant shall be subject to up to 12 months of Compliance Monitoring through Friendship Diversion Services pursuant to the Judgment and Sentence entered herein. The purpose of Compliance Monitoring is to ensure full compliance with the Judgment and Sentence, and all conditions contained therein. Defendant shall report to Friendship no later than 1/18, 2019. . .
> . . . .
> Defendant shall pay the fees and costs required, and follow the rules and guidelines of the Compliance Monitoring program, which includes compliance with all conditions of the Judgment and Sentence.

*Id.* at 64.

Gates appeals.

## ANALYSIS

### I. PROSECUTORIAL MISCONDUCT

Gates first argues that the State committed prosecutorial misconduct by cross-examining him about Dixon's and Tomco's veracity and by referring in its closing argument to Gates's failure to call Nichols or Christina as witnesses. These arguments fail.

A. LEGAL PRINCIPLES

To prevail on his prosecutorial misconduct claims, Gates must establish that the State's conduct was both improper and that the improper conduct was prejudicial in the context of the entire record and the circumstances at trial. *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003). But Gates waives any error that he failed to object to "unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012).

B. VERACITY OF WITNESSES

Gates first argues that the State engaged in prosecutorial misconduct by eliciting testimony on cross-examination from Gates "about the veracity of other witnesses," namely Dixon's testimony that he told Gates that he was suspected of dropping a bag of methamphetamine rather than "dope," and Tomco's testimony that Gates told him that the pants were new rather than that they belonged to someone else. Br. of Appellant at 8. But even assuming that this issue was properly preserved and presuming, without deciding, that eliciting this testimony was improper, it is in no way prejudicial in the context of this record.

First, whether Dixon initially told Gates that the substance in the bag found on the casino floor was methamphetamine or "dope" is irrelevant. Whether Gates knowingly possessed the bag or whether Christina placed the bag in Gates's pocket without his knowledge does not depend on what Dixon initially said to Gates or Gates's response. Second, because Gates's defense was that he had unknowingly placed the drugs in his pocket when Christina handed the bag to him with his change, whether Gates's pants were his or borrowed is also irrelevant.

Because neither Dixon's nor Gate's credibility on these issues was relevant to whether Gates possessed the drugs or whether he unwittingly possessed the drugs, Gates does not establish the prejudice required to show prosecutorial misconduct on this ground.

C. COMMENT ON GATES'S FAILURE TO CALL WITNESSES

Gates next argues that the State committed prosecutorial misconduct by "repeatedly comment[ing] on the failure of the defense to call potential witnesses" in support of his affirmative defense of unwitting possession. Br. of Appellant at 8. Even presuming that this issue was preserved, this argument also fails.

Our Supreme Court has addressed and expressly rejected this same argument in *Sundberg*. In *Sundberg*, the issue was identical to the one here, "whether a prosecutor commits error when, during closing rebuttal argument, he comments that the defendant failed to call a witness to corroborate his affirmative defense of unwitting possession of a controlled substance." 185 Wn.2d at 148. The Court held that "in a criminal prosecution where the defendant has the burden to establish an affirmative defense, no error occurs where the prosecutor comments on the defendant's failure to present evidence or testimony in support of the defense." *Sundberg*, 185 Wn. 2d at 148.

Because the State's argument was not improper, Gates fails to establish prosecutorial misconduct on this ground.

## II. COMMUNITY CUSTODY SUPERVISION BY FRIENDSHIP DIVERSION SERVICES

Gates next argues that the trial court exceeded its authority by ordering that he be "supervised" by Friendship Diversion Services, which he asserts is a "private, for-profit organization." Br. of Appellant at 11-12, 13. He contends that only the DOC has the authority to supervise an offender on "community custody." Br. of Appellant at 11.

But the trial court did not sentence Gates to community custody. The court sentenced Gates to 30 days of confinement under the first time offender sentencing alternative and then converted his term of custody into 240 hours of community restitution,[1] which was subject to monitoring by Friendship Diversion Services. Community restitution "is a 'sentence condition' that the trial court may order as a substitute for total confinement," not a form of community custody or supervision. *State v. Zabroski*, 56 Wn. App. 263, 265-66, 783 P.2d 127 (1989). Because Gates cites no authority establishing that a private entity cannot supervise an offender's community restitution, this argument fails.[2] *See* RAP 10.3(a)(5); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (an appellate court will not consider an assignment of error that is unsupported by argument or citation to authority).

### III. CHEMICAL DEPENDENCY EVALUATION

Gates also argues that the trial court erred in ordering him to obtain a chemical dependency evaluation. The State concedes that because the trial court did not find that a chemical dependency had contributed to this offense, the trial court lacked the authority to require a chemical dependency evaluation.

When sentencing a defendant as a first time offender, the trial court may impose conditions authorized under RCW 9.94A.703. RCW 9.94A.650(4). RCW 9.94A.703(3)(d) allows the trial court to require a defendant to participate in rehabilitative programs or perform other affirmative conduct reasonably related to the offense. Here, the trial court struck the finding that a chemical

---

[1] Community restitution was formerly known as community service. *State v. Law*, 154 Wn.2d 85, 106, 110 P.3d 717 (2005).

[2] Additionally, the record contains no information regarding the county's, State's, or DOC's legal relationship with Friendship Diversion Services, beyond the fact the trial courts use its supervision services in some cases. Without such additional information, we would be unable to fully evaluate the trial court's authority to utilize Friendship Diversion Services for supervisory purposes.

dependency contributed to the offense, so there was no finding that the chemical dependency evaluation was reasonably related to the offense. Accordingly, we accept the State's concession and remand for the trial court to vacate the order for compliance monitoring by Friendship Diversion Services to the extent it applies to the chemical dependency evaluation and treatment.

We affirm Gates's conviction, but we remand for the trial court to vacate the order for compliance monitoring to the extent it applies to the chemical dependency evaluation and treatment.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, J.

We concur:

SUTTON, A.C.J.

GLASGOW, J.